UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**KERRY KOTLER,**

                             **Plaintiff,**

                    **v.**                                    **06-CV-1308**

**JOHN DONELLI, Superintendent, Bare Hill Correctional
Facility, L. JUBERT, Deputy Superintendent of Security,
LINDA TURNER, Deputy Superintendent of Programs, W.
DANN, Correction Sergeant, DARWIN DAILY and
DAVID CHARLAND, Correction Officers, THOMAS
EAGEN, Director, Inmate Grievance Program, in their
individual capacities, and DONALD SELSKY, Director,
Special Housing/Inmate Discipline, in his individual and
official capacities,**

                             **Defendants.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:
Prisoners' Legal Services of New York
Michael E. Cassidy, Esq., of counsel
Stacy L. Graczyk, Esq., of counsel
121 Bridge Street, Suite 202
Plattsburgh, New York 12901
Attorneys for Plaintiff

Office of the Attorney General, State of New York
Roger W. Kinsey, Esq., of counsel
State of New York
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

          Defendants move (Dkt. No. 30) for summary judgment dismissing this action brought

pursuant to 42 U.S.C. § 1983 ("section 1983") by an inmate in the custody of the New York

Department of Correctional Services ("DOCS"). In his complaint (Dkt. No. 1), plaintiff claims

that defendants conspired to plant a weapon in his cell at Bare Hill Correctional Facility ("Bare Hill") and to pursue a false disciplinary charge against him for possessing the weapon. According to plaintiff, these actions, which resulted in discipline and impeachment from his position on the Inmate Grievance Resolution Committee ("IGRC"), were taken in retaliation for his participation in and utilization of the Inmate Grievance Program ("IGP"), thus violating his First and Fourteenth Amendment rights. For the reasons set forth below, the Court grants summary judgment and dismisses the action on the merits.

### THE COMPLAINT

Briefly, the defendants named in the complaint are as follows: Correction Sergeant W. Dann ("Dann"), who directed Correction Officer Darwin Daily ("Daily") to search plaintiff's cell; Daily, who searched plaintiff's cell and found a weapon; Correction Officer David Charland ("Charland"), who was in the vicinity when Daily found the weapon; John Donelli ("Donelli"), Superintendent at Bare Hill, who directed Deputy Superintendent of Security L. Jubert ("Jubert") to conduct a disciplinary hearing on the charges stemming from the finding of the weapon; Jubert, who conducted the disciplinary hearing; Deputy Superintendent of Programs Linda Turner ("Turner"), who conducted the hearing to impeach plaintiff from his position as IGRC representative; Donald Selsky ("Selsky"), DOCS Director of Special Housing/Inmate Discipline, who reviewed Jubert's disciplinary hearing disposition and Turner's impeachment hearing disposition; and Thomas Eagen ("Eagen"), DOCS Director of Inmate Grievance Program and a CORC member.

Plaintiff's complaint alleges the following. In summer 2003, shortly after Donelli became Superintendent at Bare Hill, plaintiff was elected to serve as one of the two inmate representatives

on Bare Hill's IGRC.  The IGRC is the first level of the three-tiered inmate grievance process. The IGRC comprises two facility representatives, two inmate representatives, and a civilian DOCS employee, the Inmate Grievance Supervisor.  The IGRC is responsible to review, investigate, and issue a recommendation on each inmate grievance filed through Bare Hill's IGP. The inmate may appeal the IGRC recommendation to the Superintendent, after which he may appeal to the Central Office Review Committee ("CORC") at DOCS in Albany.   In August, September, and October 2003, plaintiff received counseling notices regarding some of his recommendations as IGRC representative.  Plaintiff also filed grievances on his own behalf and appealed them to the Superintendent and then to CORC.

According to the complaint[1]:

> On November 1, 2003, defendant DAILY conducted a search of plaintiff KOTLER's cube at Bare Hill, at the alleged request of defendant DANN who in turn claimed he ordered the search because of an anonymous note he had received indicating that plaintiff was in possession of a weapon.
>
> Defendant DAILY claimed that within only a few minutes of commencing the search of plaintiff KOTLER's cube he discovered a weapon fashioned from a metal can lid amongst plaintiffs property, despite the fact that plaintiff KOTLER had an enormous amount of property in his cube, totaling some fifteen large bags once it was all packed up.
>
> Plaintiff KOTLER did not in fact make, receive, or possess the alleged weapon.
>
> Plaintiff KOTLER was thereupon immediately placed in disciplinary confinement in the facility Special Housing Unit ("SHU") pending disciplinary charges.
>
> That same day defendant DAILY wrote a misbehavior charging plaintiff KOTLER with violation of Rule 113.10, possession of a weapon.

---

[1] The Court has not edited or altered the quoted portions of the complaint, except to omit the paragraph numbering.

Defendant JUBERT was directed by defendant DONELLI to preside over plaintiff KOTLER's disciplinary Superintendent's Hearing.

On November 5, 2003, defendant JUBERT commenced the Superintendent's Hearing.

Plaintiff KOTLER pled not guilty to the charge and denied that he ever possessed the weapon allegedly discovered and with which he had been charged.

Plaintiff KOTLER argued and attempted to show at the hearing that, among other things, based upon the temporal proximity of certain protected grievance activities that the weapon was planted in his cell by staff in retaliation for those protected activities and in order to punish him and obtain his removal from the IGRC.

During the hearing defendant DAILY gave incredible and conflicting testimony regarding events surrounding the alleged search of plaintiffs property.

During the hearing defendant CHARLAND also provided false and misleading testimony in order to help advance the adverse and retaliatory actions against plaintiff KOTLER.

On November 19, 2003, at the conclusion of the hearing, defendant JUBERT found plaintiff KOTLER guilty of the weapon charge and imposed a penalty of 12 months confinement to SHU, with corresponding loss of commissary, package, phone, and recreation privileges. Defendant JUBERT imposed a recommended loss of 12 months of good time as well. He also formally recommended plaintiffs removal from the IGRC and that he be barred from participating as a member of any IGRC for a period of three years.

On November 23, 2003, defendant TURNER presided over an impeachment proceeding, as directed by defendant DONELLI, in which she formally removed plaintiff KOTLER as an elected inmate representative of the Bare Hill IGRC and also banned him from acting as an IGRC representative for three years, in accordance with defendant JUBERT's November 19 Superintendent's Hearing disposition.

Defendant TURNER conducted a fairly short and perfunctory impeachment hearing, expressing little interest or concern in plaintiff KOTLER's allegations of or evidence of retaliation.

-4-

These adverse actions - the planting of a weapon in plaintiffs cell, the false and fabricated disciplinary charge, the false and misleading testimony in support of that charge, and the resulting penalties, including his removal from the IGRC and from the Bare Hill general population, as well as the three-year ban from acting as an IGRC representative - were all taken in retaliation for and/or as a result of retaliation for plaintiffs protected activities as an IGRC representative and his related grievances and grievance activities.

On November 19, 2003, following the conclusion of the Superintendent's hearing and after having turned off the tape recorder, defendant JUBERT indicated and made clear to plaintiff KOTLER that he had been set up with the weapon at the behest of defendant DONELLI because of his IGRC and grievance-related activities and in order to get rid of him.

Thus defendant JUBERT had conspired with the other defendants and served as a biased hearing officer by dishonestly suppressing evidence of plaintiff's innocence of the weapon charge and evidence in support of plaintiff's defense that he was retaliated against for his grievance-related activities.

In the preceding months while serving as an IGRC representative at Bare Hill, plaintiff KOTLER had observed and experienced what he perceived to be numerous and significant problems and shortcomings in the grievance process, which he believed were unlawful, unfair and undermining of the IGP and the function and purpose behind the IGP as a mechanism to resolve inmate complaints and problems.

Some of the perceived problems and shortcomings plaintiff KOTLER observed were similar to those he had seen and experienced during his previous participation in the IGRC.

Plaintiff KOTLER voiced his concerns about the IGP on numerous occasions and in a variety of ways to the IGP supervisors and others in the Bare Hill Administration, both informally and within his capacity as an IGRC representative.

Plaintiff KOTLER also filed a number of formal grievances further documenting and complaining about the problems he saw in the operation and function of the IGP program at Bare Hill and seeking institutional and departmental resolution of those problems.

Indeed, in the weeks leading up to the November 2003 adverse and retaliatory actions at issue in this litigation, plaintiff KOTLER filed a

number of grievances that were highly critical of the Bare Hill
Administration, facility grievance office, and facility grievance process as a
whole.

On September 19, 2003, just seven weeks before plaintiff KOTLER was set
up with the weapon, he filed a grievance that was highly critical of
defendant Superintendent DONELLI and Bare Hill IGP Supervisor G.
Stanley.

In that grievance plaintiff KOTLER complained, among other things, about
the failure to provide appropriate staff coverage for and training and
supervision of the IGP at Bare Hill and the overall failure otherwise to
ensure that the grievance process was operated properly and in accordance
with DOCS regulations.

On September 27, 2003, plaintiff KOTLER submitted another grievance
against GP Supervisor Stanley for wrongfully prohibiting and preventing
plaintiff KOTLER from conducting any investigations of inmate
grievances in his role as IGRC representative.

On October 1, 2003, several days after submitting the above grievance and
just four weeks before the weapon was planted and the charge fabricated,
IGP Supervisor Stanley issued another written formal Inmate Counseling
Notification, which included threats that plaintiff KOTLER would be
dismissed and removed from the IGRC if he persisted in what IGP
Supervisor Stanley deemed inappropriately written responses to
grievances, as set forth in the counseling notification.

This formal counseling related to plaintiff KOTLER's written grievance
decisions in four separate inmate grievances complaining about medical
care, dated September 17, 24, 25, and October 1, 2003.

Similar to the counseling in July 2001, IGP Supervisor Stanley
characterized plaintiff KOTLER's grievance recommendations as an IGRC
representative as "adversarial" and based upon "personal opinion and
speculation" and that they demonstrated a failure to use a "willing and
tactful attitude."

Plaintiff KOTLER objected to the Inmate Counseling Notification in a
formal grievance he submitted on that same day, October 1, 2003.

In his grievance and appeals of the denial of this grievance over the Inmate
Counseling Notification, plaintiff KOTLER sought clarity as to how his
determinations were inappropriate. He also maintained that there was

-6-

nothing improper or adversarial in his recommendations and suggested that as an IGRC representative he should be allowed to write opinions and make factual findings which may differ from and be critical of prison administrators, all without being threatened with impeachment.

On October 22, 2003, just ten days before the weapon was planted in his cube, defendant Superintendent DONELLI issued a decision denying plaintiff KOTLER's grievance and request that the Inmate Counseling Notification be rescinded.

On October 29, 2003, plaintiff KOTLER appealed defendant DONELLI's decision, and on October 30 the appeal was apparently logged in the Bare Hill Grievance Office and thereafter forwarded to CORC at DOCS Central Office in Albany.

On November 12, 2003, CORC upheld defendant DONELLI's decision denying the grievance.

Also on October 1, 2003, plaintiff KOTLER submitted another grievance alleging that IGP Supervisor Stanley improperly handled two inmate grievances in which the inmates complained about an unduly long delay and wait for enrollment in the Alcohol and Substance Abuse Treatment ("ASAT") program at Bare Hill.

Specifically, these grieving inmates had claimed in their grievances that Bare Hill staff had repeatedly told them that they were on the "waiting list" for the program, and in one inmate's case that he had been told this for over three years.

During the IGRC hearings on these inmates' grievances about ASAT, plaintiff KOTLER requested an adjournment of the hearings in order to investigate the status of the inmates on the waiting list, which requests were denied by IGP Supervisor Stanley.

In his subsequent October 1, 2003, grievance plaintiff KOTLER claimed that IGP Supervisor Stanley's denial of an adjournment was both improper as to the grieving inmates involved and that it improperly denied plaintiff an opportunity to meaningfully carry out his duties as an IGRC representative.

In that same grievance plaintiff KOTLER further asserted that IGP Supervisor Stanley's actions appeared "to be an attempt to hide the fact that no such list is being maintained and that these inmates, and hundreds of others like them, have been lied to; and that at Bare Hill placement in

the ASAT Program is being arbitrarily and capriciously denied." Plaintiff also requested in his grievance that CORC "examine any list that administrators at Bare Hill claim to maintain."

On October 22, 2003, only twelve days before plaintiff KOTLER was set up with the weapon, defendant DONELLI issued a decision on plaintiff's grievance, stating in part, "[sic] Thus exceeding the program's interest for personal edification and offering opinion unsubstantiated by facts. Grievance is affirmed in part that meaningful investigation [sic] are occurring."

On October 26, 2003, less than a week before the weapon was planted in his cube, plaintiff KOTLER appealed to CORC, which subsequently on November 19, 2003, issued a decision affirming defendant DONELLI's decision.

In early October, not long after plaintiff KOTLER filed his grievances against IGP Supervisor Stanley, Mr. Stanley left both his position as IGP Supervisor and Bare Hill, for reasons unknown to plaintiff KOTLER.

On October 21, 2003, twelve days before the weapon was planted in his cube, plaintiff KOTLER submitted a grievance about his elderly and handicapped mother being treated poorly by Bare Hill staff when she came to visit him on October 18, 2003.

In that grievance plaintiff KOTLER complained that his mother had been made to wait an inordinately long period of time for the visit to be processed, a delay which plaintiff said he had been told was due to a "work slow down" by officers at Bare Hill resulting from friction with the still relatively new facility Administration over post assignments being shuffled and altered.

Plaintiff KOTLER's requested relief in the above-referenced grievance was for the DOCS Commissioner to "monitor any work slow down by staff in processing visits at Bare Hill, and intervene to resolve this problem, where the family and friends of prisoners should not be treated in such an unreasonable manner."

On October 28, 2003, just four days before he was set up with the weapon, plaintiff KOTLER submitted yet another grievance highly critical of the Bare Hill Administration and its grievance office and program.

Specifically, plaintiff KOTLER asserted in that grievance that the new IGP Supervisor Walbridge had relayed to him that per direction of defendant

-8-

DONELLI, via Deputy Superintendent Huntington, both inmate and staff representatives on the IGRC were no longer allowed to use adjectives when writing opinions and recommendations that are critical of the medical department.

Plaintiff further noted in that grievance that when he asked for clarification of this prohibition on the IGRC's use of adjectives, he was told they "could no longer say a delay was 'long' or that it was 'unreasonable,' regardless of any factual findings/conclusion made by the committee."

Plaintiff concluded his grievance with these words:

> The new executive team should stop trying to manipulate and suppress decisions and opinions of the IGRC which may be critical of them, but instead work harder to eliminate the source of the perceived criticism.

> Truth is, a significant number of grievances written at this facility are related to improprieties of the medical department/staff, and it is these issues which need to be addressed, not the IGRC's recognition of them.

> Requested action:
> That administrators at Bare Hill stop trying to suppress the opinions and recommendations of the IGRC when they are critical of them and/or their staff; and allow the grievance program to function in a legitimate and effective manner.

Defendant DONELLI denied the above grievance and CORC upheld his denial.
***

Briefly summarized, the five causes of action in the complaint allege as follows:

1.    By retaliating against plaintiff and/or conspiring to retaliate against him for his protected grievance-related activities, defendants Donelli, Jubert, Turner, Dann, Daily, and Charland violated plaintiff's First and Fourteenth Amendment rights.

2.    By failing to intervene in the retaliation alleged in the first cause of action, defendants Turner, Eagen, and Selsky tacitly authorized the retaliation, in violation of plaintiff's First and Fourteenth Amendment rights.

3.    In failing to supervise the IGP to protect plaintiff and other inmates from

retaliation for utilizing the grievance process and for actions taken as an IGRC representative, and otherwise failing to remedy such wrongs, defendant Eagen tacitly authorized the retaliation, in violation of plaintiffs' First and Fourteenth Amendment rights.

4.    In conspiring with the other defendants and serving as a biased disciplinary hearing officer by suppressing evidence that plaintiff was innocent of the weapon charge and was retaliated against for his grievance-related activities, defendant Jubert violated plaintiff's Fourteenth Amendment due process rights.

5.    By his actions in upholding, affirming and modifying defendant Jubert's disposition at the Superintendent's Hearing disposition, defendant Selsky violated plaintiff's Fourteenth Amendment due process rights.

Plaintiff asks for declaratory and injunctive relief, as well as compensatory and punitive damages.

## THE RECORD

Plaintiff's counsel deposed twelve witnesses.  Defendant Superintendent Donelli, who directed defendant Deputy Superintendent of Security Jubert to preside over plaintiff's Superintendent's Tier III disciplinary hearing ("disciplinary hearing"), testified that he did not "set up" plaintiff with a weapon, did not direct anyone to do so, was in no way involved in doing so, and had no information that anyone had done so.  Plaintiff also deposed defendant Jubert, who said much the same thing.  Jubert also testified about his conduct of the disciplinary hearing.  Much of the questioning of these witnesses concerned the grievances plaintiff filed and his activities as IGRC representative.

Defendant Correction Sergeant Dann was deposed and testified that on November 1, 2003, he received an anonymous note in his mailbox that an inmate had a "shank"; that he directed defendant Correction Officer Daily to "take a look" at the inmate's cube[2]; that shortly thereafter

---

[2] The parties refer to plaintiff's cell at Bare Hill as a "cubicle" or "cube."

he was notified that Daily had found a weapon; that after plaintiff was removed, Dann instructed Daily to search and secure plaintiff's property; and that Dann then did the paperwork.

Defendant Correction Officer Daily testified that on November 1, 2003, Sergeant Dann called him and told him to search a particular cube; that he searched the cube, which was plaintiff's; that in a cup with pens and pencils in it he found a weapon, which he described as "a can top bent over and taped"; that plaintiff was nearby and said, "That's not mine"; that Daily handcuffed plaintiff and called Dann; and that Dann arrived with officers who removed plaintiff. Daily stated that he then searched plaintiff's property, put it in bags, and secured it in a storage area. Later, another officer filled out an "I64 form" (an inventory) for plaintiff's property and packed it up.

Defendant Correction Officer Charland testified in his deposition that on November 1, 2003, he was working the shift in plaintiff's section when Daily came to search plaintiff's cube; that he was told that Daily had found a weapon; and that as far as he recalls he was not the officer who searched or secured plaintiff's property after plaintiff was removed.

Plaintiff further deposed defendant Turner, Deputy Superintendent of Programs. Turner, who conducted plaintiff's impeachment hearing, testified that her role was merely to determine whether the charge of possessing a weapon, of which plaintiff had already been found guilty, warranted removal from the IGRC. She determined that it did, and directed plaintiff's impeachment from the IGRC and disqualification for three years. Plaintiff also deposed defendant Eagen, DOCS Director of the IGP, who testified at length about the IGP and the role of the IGRC representatives. Plaintiff deposed defendant Selsky, DOCS Director of Special Housing/Inmate Discipline. Selsky is responsible for reviewing inmates' appeals from

-11-

disciplinary and IGRC impeachment determinations.  He reviewed Jubert's disciplinary hearing disposition and Turner's impeachment hearing disposition stemming from the weapon in plaintiff's cube.  Most of his testimony concerned the appeals process in general.

Finally, plaintiff deposed four non-party witnesses.  Paul Walbridge, Bare Hill's recreation supervisor, stated he occasionally filled in as IGP Supervisor and served on the IGRC. He said he knew nothing about a weapon being found in plaintiff's cube.  Greg Stanley, an IGP supervisor, testified about plaintiff's activities as an IGRC representative, and stated he had no knowledge about plaintiff's claim that he had been set up in retaliation for his grievances.  Karen Bellamy, assistant grievance director, testified about grievance procedures.  She said she did not remember plaintiff, his grievances, or his conduct as IGRC representative.  Peter Berezny, grievance coordinator, recalled that Greg Stanley felt plaintiff was an uncooperative and divisive IGRC representative and that Superintendent Donelli "was seeing if he could remove" plaintiff from the IGRC on this ground.  Berezny recalled little else about plaintiff's grievances and IGRC activities, and had no recollection of plaintiff's weapon charge, discipline, or impeachment.

Defendants also include in the record the transcript of plaintiff's disciplinary hearing. Defendant Jubert, the hearing officer, interviewed plaintiff, Daily, Charland, and Dann, and, at plaintiff's request, inmates Dragon, Brown, Vasquez, and Ramos.

In particular, Jubert questioned Daily at length regarding the finding of the weapon in plaintiff's cube.  Daily's statements include the following: he was instructed to search the cube; he was not told to look for anything in particular; he did not place any contraband in the cube; he is not aware of any other inmate or staff person having done so; and he has never been involved in such a scheme.  Jubert also interviewed Dann, who stated that he received an anonymous note,

-12-

apparently from an inmate, alleging that plaintiff had a shank in his cube; that he receives many

such notes and investigates them all; that he instructed Daily to "frisk" the cube; and that

thereafter Daily called him to the cube and showed him the weapon.  Dann stated he did not place

any contraband in the cube; he is not aware of any other inmate or staff person having done so;

and he has never been involved in doing such a thing.  According to their statements, none of the

inmate witnesses had seen anyone place anything in plaintiff's cube.

During most of the disciplinary hearing, plaintiff pursued the theory that another inmate,

one Decarlo, had planted the weapon in his cube.  The hearing transcript is devoid of support for

this theory, and by the end of the hearing, plaintiff expressed the belief that Daily, not inmate

Decarlo, was the culprit.  Plaintiff referred to evidence that Daily found the weapon quickly

although plaintiff's cube was crowded with legal papers and other property.  Plaintiff also relied

on a "discrepancy" between the testimony of Daily and Charland regarding who had "packed up"

and stored the property from plaintiff's cube after Daily had found the weapon.  Later in the

hearing the purported discrepancy was resolved when Daily explained what he meant by the term

"pack up."

At the close of the hearing, Jubert briefly summarized the proceedings and stated that

there was "no evidence or testimony which supports that anyone, staff or inmate, is responsible

for the weapon found in [the] cubicle except [plaintiff.]"  He found plaintiff guilty of possession

of a weapon and sentenced him to Special Housing Unit and loss of privileges and good time for

12 months.  On appeal, DOCS Director of Special Housing/Inmate Discipline Donald Selsky

reduced the penalty to six months.  On plaintiff's appeal, CORC affirmed.  Thereafter, defendant

Linda Turner, Deputy Superintendent of Programs, held an impeachment hearing, resulting in

plaintiff's impeachment from IGRC and disqualification for three years.

### THE MOTION

On the instant motion for summary judgment, defendants argue primarily that plaintiff cannot establish that defendants retaliated against him for exercising his First Amendment rights. They also argue that plaintiff has failed to show personal involvement on the part of defendants Donelli, Jubert, Turner, Dann, Charland, Eagen, and Selsky; that the conspiracy claim must be dismissed for failure to state a claim; and that defendants are entitled to qualified immunity.

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in nonmovant's favor, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a genuine issue of material fact requiring a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* at 248. If the nonmovant fails to carry this burden, summary judgment is appropriate. *See Celotex,* 477 U.S. at 323-24.

To prove a First Amendment retaliation claim under section 1983, a prisoner must show the following elements: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action. *See Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). To show a causal connection, plaintiff must show that his protected conduct was a

-14-

"substantial" or "motivating" factor in the decision to take adverse action against him. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). A defendant may show lack of a causal connection by showing that the adverse action would have been taken in the absence of plaintiff's protected conduct. *See id.*; *Salahuddin v. Perez*, 216 Fed.Appx. 69, 70-71 (2d Cir. 2007) (upholding summary judgment dismissing a retaliation claim where plaintiff failed to create a question of fact as to "whether the correctional officers' decision would have been made regardless of the conduct [plaintiff] claims was protected, as it is undisputed that he made unauthorized phone calls in violation of prison rules."). Because prisoner retaliation claims are easily fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, the Second Circuit requires an inmate to advance non-conclusory allegations to survive a motion for summary judgment. *See Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

## DISCUSSION

For purposes of this motion, defendants do not dispute that plaintiff's conduct on the IGRC and in filing grievances is protected conduct. Nor do they dispute that the weapon charge and ensuing discipline and impeachment from the IGRC constitute adverse actions. Rather, they contend that plaintiff has no evidence that the adverse actions were taken in retaliation for the protected conduct. Specifically, defendants contend that no rational trier of fact could find a causal connection between the protected conduct and the adverse actions, because the decisions to charge, discipline, and impeach plaintiff would have been made regardless of plaintiff's grievances and IGRC-related conduct. *See Salahuddin*, 216 Fed.Appx. at 70-71. Defendants rely on competent evidence establishing that the finding of a weapon in plaintiff's cube was the

-15-

motivating reason for the charge, discipline, and impeachment, and that there is no causal nexus between the protected conduct and the adverse action.

Plaintiff argues that there is a question of fact on the issue of causation. He relies on evidence of temporal proximity between certain grievances and IGRC-related conduct, and the adverse actions of the weapon charge, discipline, and impeachment. It is true that in some cases, proximity in time between protected conduct and an adverse action can constitute a showing of a causal connection sufficient to resist summary judgment. *See, e.g., Espinal*, 558 F.3d at 129. In the circumstances of the instant case, however, the temporal proximity between plaintiff's protected conduct and the adverse actions does not permit an inference of a causal nexus. Defendants have already shown a legitimate reason for the adverse actions by showing that a weapon was found in plaintiff's cube. Indeed, the weapon was found **after** the alleged grievances and other protected conduct occurred; thus, the finding of the weapon intervenes between the protected conduct and the adverse action.[3] In addition, plaintiff has an extensive grievance history,[4] and there is no evidentiary basis to single out certain of his many grievances as providing the motivation for the adverse actions. Although plaintiff offers a great deal of speculation in this regard, he adduces no evidence raising a question of fact on whether defendants would have taken the same action in the absence of plaintiff's grievances and IGRP activities.

Plaintiff also attempts to raise a question of fact on causation by claiming that defendants

---

[3] Plaintiff was charged with weapon possession on November 1, 2003, the day the weapon was found, and the disciplinary hearing began a few days later, whereas most of the grievance filings and IGRC recommendations cited in the complaint occurred on October 1, 2003 or earlier.

[4] Plaintiff had filed over 80 grievances between 1998 and November 1, 2003; twenty-four of these were filed between February 11, 2003 and November 1, 2003, while plaintiff was at Bare Hill.

-16-

conspired to plant the weapon and pursue a false disciplinary charge against him.  Plaintiff

contends that defendants took these actions in retaliation for his protected conduct and to create a

pretext for retaliatory adverse action against him.  Therefore, he argues, the real reason for his

charge, discipline, and impeachment was defendants' wrongful retaliatory actions, not the

presence of a weapon in his cube.

In support of the theory that defendants framed him, plaintiff relies on exhaustive

evidence of his actions as an IGRC representative, defendants' attempts to counsel him regarding

these actions, his numerous grievances, and defendants' alleged desire to remove him from the

IGRC.  Nothing but speculation connects this evidence with the finding of the weapon in

plaintiff's cell and the ensuing discipline and impeachment.

Plaintiff cites to his own deposition testimony as evidence that defendants planted the

weapon in his cube.[5]  He testified as follows:

> Q. You indicated at the end of your hearing with Mr. Jubert, that he turned
> off the tape recorder and indicated and made clear that you had been set up
> with a weapon?
> A. Yes, sir.
> Q. Is there any witness to that comment?
> A. No. Other than me, no, sir.
> Q. Did you have any other discussion with him about his comments during
> that period?
> A. No, sir.
> Q. Did you ask him —
> A. No other discussions other than the comments he made in the
> conversation we had.
> Q. What was the sum and substance of the conversation after he made
> those comments?
> A. Well, he said that, well, my boss tells me I got to get rid of you, I got to
> get rid of you.  Something to that effect.  So, I said, so, you're admitting
> you're setting me up.  Actually, I said that before, and he told me I

---

[5] Plaintiff also submits his own unsworn handwritten notes which are similar to his deposition testimony.

shouldn't be involved in other people's problems; I should just worry about myself; something to that effect.
Q. Did he ever indicate to you in the words "you were set up"?
A. I'm not sure he used those exact words, I was "set up", but he told me that "when my boss says to get rid of you", I took it as he's admitting he set me up.
Q. But his words were his boss wanted him to get rid of you?
A. Yes, sir.
Q. Was there anything else that he said to you?
A. What I said a moment ago, that I should start worrying about myself, stop worrying about other inmates.  Something to that effect.
Q. Anything else that you recall?
A. Not that I recall right now.

On a plain reading, the above testimony does not support a finding that defendants planted a weapon in plaintiff's cube.  A direction to "get rid of plaintiff" could mean any number of things and cannot rationally be construed as evidence that one or more defendants framed plaintiff by planting a weapon in his cube.  For example, it could mean that Jubert was told that if he found plaintiff guilty of the weapon charge, he should recommend removal from the IGRC.

In any event, plaintiff's statement that Jubert said to him, "my boss tells me I got to get rid of you, I got to get rid of you" is not competent evidence that any defendant engaged in wrongful conduct to get rid of plaintiff, by planting a weapon or otherwise.  The statement is hearsay insofar as plaintiff relies on it as evidence that Jubert had to get rid of plaintiff, and double hearsay insofar as plaintiff relies on it as evidence that Jubert's "boss" (presumably Superintendent Donelli) told Jubert to get rid of plaintiff.  Thus, plaintiff's testimony that Jubert had to get rid of plaintiff because Donelli told him to do so is not based on personal knowledge; as such, it is not admissible and cannot be used to resist summary judgment.  *See* Fed. R. Civ. P. 56(e) (providing that affidavits on a summary judgment motion "shall set forth such facts as would be admissible in evidence"); *Feingold v. New York*, 366 F.3d 138, 155, n.17 (2d Cir. 2004)

-18-

(rejecting hearsay testimony offered in opposition to summary judgment on ground that it is not admissible evidence); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (observing that, since the object of a summary judgment motion is to discover whether the non-movant has any real support for its version of the facts, the court need consider only admissible evidence in ruling on the motion).

In almost nine hundred pages of deposition transcripts and more than two hundred pages of grievances and other documents, plaintiff adduces no competent evidence that any defendant planted the weapon, procured the planting of the weapon, had knowledge that the weapon was planted, or was involved in any wrongdoing whatsoever. The record is devoid of admissible evidence supporting plaintiff's contention that defendants "set [him] up with a weapon" in retaliation for his protected activities, or that defendants charged, disciplined, and impeached him for a retaliatory or otherwise improper reason. Plaintiff cannot compensate for this failure of proof by relying on unsupported speculation.

In sum, no reasonable factfinder could conclude on this record that plaintiff's protected activities – and not the weapon in his cube – were the real cause for the adverse actions. Having found as a matter of law that plaintiff has no evidence in support of his retaliation claim, the Court grants summary judgment dismissing, as to all defendants, the first cause of action for retaliation, the second cause of action for failing to intervene in the retaliation, and the third cause of action for failing to supervise the IGP to prevent retaliation.

The fourth cause of action claims that Jubert denied plaintiff due process at the disciplinary hearing, and the fifth cause of action claims that Selsky denied plaintiff due process by upholding Jubert's disciplinary disposition. These two causes of action are based on plaintiff's

allegations that Jubert conspired with other defendants, acted as a biased hearing officer, and suppressed evidence that plaintiff was innocent of the weapon charge and was retaliated against for his IGP and IGRC activities.  These claims are defeated by defendants' uncontradicted evidence that the discipline was not retaliatory and by plaintiff's failure to adduce any evidence of a conspiracy, a "set-up", bias, retaliation, or other wrongdoing by any defendant.  Moreover, on reviewing the transcript, the Court finds that the hearing was thorough and fair.  In particular, Jubert allowed plaintiff ample opportunity to pursue his defense that the weapon was planted in his cube.  Summary judgment is granted dismissing the fourth and fifth causes of action.

## CONCLUSION

It is therefore

ORDERED that the motion for summary judgment (Dkt. No. 30) is granted; and it is further

ORDERED that the action is dismissed.

IT IS SO ORDERED.

Date:   September 16, 2009
        Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

-20-